## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Nutrisoya Foods Inc.,
a Canadian corporation,

    Plaintiff,

 v.

Sunrich, LLC, doing business as
Sunrich Foods, Inc., a Minnesota
limited liability company,

    Defendant.

Case No. 08-cv-00025 (ADM/JJK)

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

## INTRODUCTION

Nutrisoya Foods Inc. ("Nutrisoya") is a Canadian company that sells a rice-based beverage product to retailers. Sunrich Foods, Inc. ("Sunrich") is a Minnesota company that produces and packages a wide variety of food products, including rice-based beverages. In 2004, Nutrisoya and Sunrich formed a business relationship based on a rice-beverage manufacturing and packaging agreement. In 2006, Nutrisoya breached the 2004 agreement by failing to pay Sunrich's invoices in full. Sunrich sued Nutrisoya in Canada for the uncollected sums. Nutrisoya settled the lawsuit by paying the amounts due. Nutrisoya has now brought suit in the United States, alleging that Sunrich breached the manufacturing and packaging agreement by not filling orders on time.

The undisputed facts demonstrate that Nutrisoya's claims are barred by the prior breach doctrine. Because Nutrisoya failed to comply with the "Manufacturing and Packaging Plan" section of the agreement, which required Nutrisoya to provide monthly,

written plans that would establish when Sunrich would provide product to Nutrisoya, Nutrisoya's suit for breach based upon untimely tender does not stand.  As specified in the manufacturing and packaging agreement, Nutrisoya's projections enabled Sunrich to plan its long-term and short-term production.  Nutrisoya did not provide the plans and, therefore, never fulfilled its obligation to establish production forecasts under the agreement.  The facts are undisputed that Nutrisoya materially breached the agreement prior to any alleged breach by Sunrich and that Sunrich did not breach the agreement at any time.  Based on these undisputed facts, Nutrisoya's claims fail as a matter of law.

In addition, Nutrisoya had the burden under the agreement to establish delivery dates via the production plans and failed to do so.  Finally, satisfying the production plans formed a basic assumption on which the contract was made, and Nutrisoya frustrated that assumption by failing to provide the production plans.

In the alternative, Sunrich respectfully requests that the Court dismiss Nutrisoya's claims for damages allegedly incurred after January 1, 2007.  Nutrisoya seeks damages for a three-year contract renewal period after the agreement's term expired on January 1, 2007.  The facts are undisputed that Nutrisoya did not provide notice of renewal to Sunrich and did not meet the minimum ordering requirements to satisfy the renewal provision.  Moreover, any argument that Nutrisoya *would have* given notice of renewal and *would have* dramatically increased its orders in the months after Nutrisoya's cancellation of the agreement is unduly speculative and fails as a matter of law.

## FACTS

**A.     The Manufacturing and Packaging Agreement**

**1.     The Paragraph 6 Forecasts**

In January 2004, Nutrisoya and Sunrich executed a Manufacturing and Packaging Agreement ("Agreement") by which Sunrich agreed to manufacture and package an aseptically packaged organic rice-based beverage product ("Product") on behalf of Nutrisoya.  Pursuant to the Agreement, Sunrich manufactured and packaged the Product at Sunrich's facility in Alexandria, Minnesota.   Sunrich then delivered the finished Product to Nutrisoya for sale in Canada, the Caribbean Islands, and Central America. (Jenkins Decl. ¶ 3.)

The Agreement mandated that Nutrisoya follow very specific procedures to schedule production at Sunrich's manufacturing and production plant.  In particular, the Agreement required Nutrisoya to transmit a written "monthly manufacturing and packaging projection plan for the Product, for a period of three consecutive months." (*See* Kluz Decl., Ex. 1,[1] § 6.1.)  The Agreement further provided that "[a]t least 21 days before the beginning of each month, Nutrisoya *shall* transmit to Sunrich, *for its approval*, a *written* plan confirmation for the subject month *to enable Sunrich to better plan its short-term operations,* including the purchase of Ingredients and Packaging Components,

---

[1]  All citations to any Exhibit ("Ex.") are to Exhibits to the Declaration of Steven R. Kluz in Support of Defendant's Motion for Summary Judgment filed contemporaneously with this Memorandum of Law.

as the case may be, and *to serve the interests of Nutrisoya and its customers more adequately.*" (*See id.* § 6.2 (emphasis added).)  Paragraph 6 reads in full as follows:

### 6.   MANUFACTURING AND PACKAGING PLAN

6.1   Nutrisoya covenants to transmit in writing to Sunrich, as required by Sunrich, a monthly manufacturing and packaging projection plan for the Product, for a period of three consecutive months.

6.2   At least 21 days before the beginning of each month, Nutrisoya shall transmit to Sunrich, for its approval, a written plan confirmation for the subject month to enable Sunrich to better plan its short-term operations, including the purchase of Ingredients and Packaging Components, as the case may be, and to serve the interests of Nutrisoya and its customers more adequately.

(*Id.*)

Under Paragraph 6, Nutrisoya clearly covenanted that it would provide to Sunrich a long-term, three-month forecast under Section 6.1, and a "short-term" forecast under Section 6.2 (collectively, the "Paragraph 6 Forecasts").  (*Id.*)  As is clear from the plain meaning of the Paragraph 6 language, without possessing a "monthly manufacturing and packaging projection plan" and a "written plan confirmation," Sunrich could not schedule production time for Nutrisoya.  (*Id.*)  Furthermore, without these forecasts, Sunrich could not place orders for ingredients and packaging components for the Product.  (*Id.* § 6.2.)  Thus, the forecast requirements benefited both parties and ensured that Sunrich could meet Nutrisoya's production requirements.

The Agreement specifically sets forth two sources of manufacturing and production limits in Section 5.1, Paragraph 5 ("MANUFACTURING AND PACKAGING"):  (1) the Specifications and (2) the Manufacturing and Packaging Plan. Section 5.1 states:  "Sunrich covenants to manufacture and package the Products in packaging which it shall provide, in accordance with the Specifications and Manufacturing and Packaging Plan."  (Ex. 1, § 5.1.)  In the Section 2 "Definitions," the "Specifications" are defined as the "formulations, methods and procedures for the rice-based beverage manufactured by Sunrich under the Rice-Um brand."  (*Id.* § 22.8.) "Manufacturing and Packaging Plan" is the title of Paragraph 6, which sets out the long-term and short-term forecasts of Sections 6.1 and 6.2.  In other words, the quantities of product and timelines established in the Agreement were entirely controlled by Nutrisoya to be provided in its Paragraph 6 Forecasts.

### 2.   <u>No Modification or Waiver</u>

The Agreement also prohibited any modification to or waiver of any right in the Agreement absent a writing signed by both parties.  (*See id.* § 22.5 ("Any modification to the Agreement or waiver of a right arising therefrom shall be without effect unless it is evidenced in a writing signed by the parties.").)  Section 22.6 of the Agreement reiterated that no waiver of any right would be valid unless it was specifically set forth in writing "and only in respect of the rights and circumstances specifically contemplated in the waiver."  (*Id.* § 22.6.)  This Section further provided that "[t]he fact that a party does not require the full performance of a covenant contained in this Agreement or does not

exercise one of its rights shall not be construed as a waiver of such right or of the full performance of this covenant in the future." (*Id.*)

### 3.  Term and Renewal Provisions

The Agreement contained a Term and Renewal provision that allowed the parties to either terminate, renew, allow automatic renewal of, or stop automatic renewal of the Agreement:

> 20.1  The initial term of this Agreement shall be three (3) years from the Effective Date (the "**Term**") unless it is terminated earlier for any of the causes mentioned herein.
>
> 20.2  Nutrisoya shall have the right and option to renew this Agreement for a further period of three (3) years (the "**Renewal Period**"), provided that it has advised Sunrich, in writing, at least six (6) months prior to the expiry of the Term of its intention to exercise the said option, provided that during the twelve (12) month period prior to the exercise of the option, its purchases amount, on average, to at least five thousand (5,000) cases per month.
>
> 20.3  Subject to the foregoing, at its expiration this Agreement shall be renewed automatically on the same terms and conditions for successive periods of one (1) year (the "**Renewal**"), unless one of the parties, at least six (6) months before the expiration date of the Term or three (3) months before the expiration of a Renewal Period, as the case may be, has given the other party a notice of non-renewal.

(Ex. 1, §§ 20.1-20.3.)   Pursuant to the above sections, the Agreement could only be renewed beyond April 1, 2007, in two ways.  First, the Agreement could be renewed for a three-year term if Nutrisoya gave written notice of renewal to Sunrich at least six months prior to expiration (by October 1, 2006), *and* if during the 12 months prior to the notice

of renewal, Nutrisoya purchased, on average, 5,000 cases of the Product per month.  (*Id.* § 20.2.)  Second, the Agreement could be renewed for a one-year term if neither party, at least six months before the expiration of the term, gave notice of nonrenewal.  (*Id.* § 20.3.)

**B.   The Parties' Performance of the Agreement and Nutrisoya's Breach**

**1.   Nutrisoya's Ordering History and Failure to Submit Paragraph 6 Forecasts**

The effective date of the Agreement was April 1, 2004.  (Ex. 1,  § 2.3.) Manufacture and delivery of the Product commenced during June 2004.  (Jenkins Decl. ¶ 4.)  After entering the Agreement, Nutrisoya did not send orders to Sunrich for the finished Product at the quantity Nutrisoya pledged, and orders were made sporadically; orders were placed in three months in 2004, three months in 2005, and zero months in 2006.  (*Id.* ¶ 5; Exs. 2, 3.)  Nutrisoya's ordering history—derived from Nutrisoya's purchase orders and Sunrich's invoices—is summarized as follows:

**TABLE A:  Cases of Product Ordered by
Nutrisoya During Term of Agreement**

| Contract Months | Number of Cases Ordered | P. O. No. | P. O. Date | Documentation |
|---|---|---|---|---|
| 1/04 | 0 | | | |
| 2/04 | 6,000 | 257 | 2/27/04 | Nutrisoya Purchase Orders, Ex. 2 |
| 3/04-7/04 | 0 | | | |
| 8/04 | 1,169 | 32848 | On or before 8/05/04 | Sunrich Invoices, Ex. 3 |
| | 17,874 | 259 | On or before 8/05/04 | Sunrich Invoices, Ex. 3 |

| Contract Months | Number of Cases Ordered | P. O. No. | P. O. Date | Documentation |
|---|---|---|---|---|
| 9/04 | 2,882 | 260 | On or before 9/08/04 | Sunrich Invoices, Ex. 3 |
| 10/04-2/05 | 0 | | | |
| 3/05 | 10,215 | 261 | On or before 3/09/05 | Sunrich Invoices, Ex. 3 |
| | 10,000 | 262 | 3/11/05 | Nutrisoya Purchase Orders, Ex. 2 |
| 4/05 | 0 | | | |
| 5/05 | 10,000 | 263 | 5/04/05 | Nutrisoya Purchase Orders, Ex. 2 |
| | 7,500 | 32866-69 | On or before 5/13/05 | Sunrich Invoices, Ex. 3 |
| 6/05-9/05 | 0 | | | |
| 10/05 | 10,000 | 266 | 10/26/05 | Nutrisoya Purchase Orders, Ex. 2 |
| | 10,000 | 267 | 10/26/05 | Nutrisoya Purchase Orders, Ex. 2 |
| 11/05-4/07 | 0 | | | |

During this same period, Nutrisoya *never* scheduled production at Sunrich's facility pursuant to the Paragraph 6 requirements of the Agreement.  (*See* Ex. 4, Resp. of Nutrisoya to Sunrich's First Set of Inter., No. 16; Ex. 5, Ruelle Report, at 2.)  In its interrogatory answers, Nutrisoya stated as follows:  "Other than the responses made to Sunrich's specific inquiries, no written manufacturing and packaging projection plan or plan confirmation was provided to Sunrich."  (Ex. 4, at No. 16.)  Indeed, Nutrisoya had a habit of placing orders with Sunrich and then suddenly canceling them.  (*See, e.g.,* Ex. 6 (May 5, 2005 order for 10,000 cases canceled by Nutrisoya on June 17); Ex. 5, at 3 (October 26, 2005 order canceled).)   Although Sunrich did, on occasion, spot-fill unbudgeted orders outside the terms of the Agreement when it had the capacity,

Nutrisoya's failure to comply with the scheduling production procedures set forth in the Agreement prevented Sunrich from scheduling production time for Nutrisoya. (Ex. 5, at 2; Ex. 7, Hammer Dep., at 5, 20-21, 28.)

On May 1, 2005, Nutrisoya placed an unbudgeted order—which was not predicated on a manufacturing and packaging projection forecast or confirmation plan as required by the Agreement—for 10,000 cases of the Product and asked for delivery on May 30, 2005. (Ex. 5, at 2.) Although Sunrich agreed to spot-fill the order, it could not deliver the Product by May 30, 2005, because Nutrisoya had failed to submit a budget production forecast as required by the Agreement. (*Id.*) Sunrich was not able to fill that order until August 8, 2005. (*Id.*) Nutrisoya did not object to the delivery date.

On October 26, 2005, Nutrisoya placed Purchase Order #266 for 10,000 cases of the Product to be delivered by November 30, 2005. (*See* Ex. 2, No. 185.) On this same date, Nutrisoya placed Purchase Order #267 for 10,000 cases of the Product to be delivered by December 30, 2005 ("Order #267"). (Ex. 5, at 2; Ex. 2, No. 188.) As in the past, Nutrisoya failed to submit a written manufacturing and packaging projection forecast to allow for scheduling of production as required by the Agreement. (Ex. 5, at 2-3.) Initially, Sunrich made every attempt to spot-fill the order as requested, but given Nutrisoya's failure to schedule production, Sunrich had already booked its plant to

capacity with other customers.[2]   (Ex. 5, at 2.)   Accordingly, Sunrich notified Nutrisoya that the earliest it could fill the unscheduled order was the first week in March.  (Ex. 8.) When Sunrich notified Nutrisoya that it could not fill Nutrisoya's October 26, 2005 order until March 2006, Nutrisoya canceled the order and terminated the Agreement on or before March 16, 2006.   (Ex. 5, at 3; Ex. 9, Fuller Landau Report.)   At that point, Nutrisoya revealed that it was now using Sunrich's competitor, California Natural Products ("CNP"), to manufacture the Product.  (Ex. 9, at 274.)   Although Nutrisoya's own breach prevented Sunrich from filling the order, Nutrisoya canceled the Agreement and began using CNP.  (*Id.*)

### 2.   Nutrisoya's Testimony Regarding the Paragraph 6 Forecasts

Nutrisoya did not transmit to Sunrich the written long-term forecasts under Section 6.1 of the Agreement.  (*See* Ex. 4, Resp. of Nutrisoya to Sunrich's First Set of Inter., No. 16.)   Nutrisoya also admitted this in the Canadian proceeding during the deposition of Larry Karass, its vice president of business development.   During Mr. Karass's examination after plea, Nutrisoya's Canadian counsel stated that no Section 6.1 long-term projection was sent to Sunrich:  "Undertaking 3 is not necessary, because we didn't send three months projections."  (Ex. 10, Karass 2/26/07 Exam. after Plea, at 28.)  Mr. Karass also testified in the Canadian proceeding that Nutrisoya did not

---

[2]   According to Sunrich's unrebutted expert opinion, calculating a normal three-month lead time, the very earliest that an order of this kind could be assigned equipment capacity on Sunrich's production schedule would have been three full months after receipt of the order, or February 1, 2006.  (Ex. 5, at 3.)

provide to Sunrich a written Section 6.2 short-term projection plan confirmation on a monthly basis.  (*Id.* at 27.)

In an obvious attempt to get around the admitted absence of short-term and long-term forecasts required by the Agreement, Nutrisoya changed its story at its witnesses' depositions in the instant action and testified that the parties developed a course of business that modified the clear terms of the Agreement.  (*See, e.g.,* Ex. 11, Karass Dep. at 31.)  The Agreement, however, does not allow modification or waiver of any of its obligations without a written agreement signed by both parties.  (*See, e.g.,* Ex. 1, §§ 22.5, 22.6.)  This written agreement was noticeably absent, and nothing in the factual record suggests that a written agreement modifying the Section 6.1 and 6.2 requirements has ever existed.

In another attempt to elude the clear terms of the Agreement, Mr. Karass of Nutrisoya testified that Sections 6.1 and 6.2 did not create "obligations" for Nutrisoya, but only "expectations."  (Ex. 11, at 18-19.)  The Agreement, however, states: "Nutrisoya *covenants* to transmit in writing to Sunrich [the long-term plan]," and "Nutrisoya *shall*[3] transmit to Sunrich, for its approval, [the short-term plan]."  (Ex. 1, §§ 6.1, 6.2 (emphasis added).)

---

[3] The Minnesota Supreme Court has emphasized that it is "a well-worn maxim that use of the term 'shall' reflects a mandatory imposition."  *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 272 (Minn. 2004) (citing *Indep. Sch. Dist. No. 561 v. Indep. Sch. Dist. No. 35*, 170 N.W.2d 433, 440 (Minn. 1969)).

In their depositions, Nutrisoya's witnesses danced around the question of whether Nutrisoya sent a monthly, three-month manufacturing and packaging production forecast by claiming that they had occasional email communications and telephone conferences with Sunrich in lieu of written monthly forecasts.  The witnesses, however, could not identify specific emails or discussions where the long-term forecast was communicated. In fact, when Sunrich specifically asked in an email dated May 5, 2005, for a "long range forecast that you [Nutrisoya] could share," Nutrisoya gave a month-and-a-half forecast and nothing resembling the three-month projection required by the Agreement.  (Ex. 12.)

### 3.   Sunrich's Testimony Regarding the Effects of Nutrisoya's Failure to Submit Paragraph 6 Forecasts

Nutrisoya's undisputed breach of the Section 6.1 and 6.2 provisions is what led to this litigation.  (Jenkins Decl. ¶ 6.)  The parties had no scheduling blueprints for planning as provided in Paragraph 6 of the Agreement.  Sunrich's vice president of sales and marketing, Kim Jenkins, testified that the business relationship between the two companies was "chaotic" because Nutrisoya was "not following the contract provision 6.1 and 6.2 by any means."  (Ex. 13, Jenkins Dep., at 21-22; *see also* Ex. 13, at 27.)

Neil Hammer, Sunrich's head of customer accounts and services, testified that Nutrisoya did not regularly provide planning information required by the Agreement, and during the rare times that scattered planning information was provided, Nutrisoya did not follow that plan.  (Ex. 7, at 20-21.)  Mr. Hammer testified that he made attempts to get Nutrisoya to establish a plan when Nutrisoya wanted Sunrich to manufacture and package

the rice beverage, and, without such a plan, Sunrich "was only able to respond if we have the opportunity." (Ex. 7, at 28.)

Mr. Hammer further testified that several of Sunrich's other customers needed to use its manufacturing and packaging facilities during the relevant timeframe. To coordinate the customers' needs, it was a practical necessity that those customers provide information to Sunrich for scheduling purposes: "In my position basically I try to – well, I bring together all of the different customers' needs to try to integrate them into a plan so that we can put together a forecast or plan of what we're going to do in operations." (Ex. 7, at 5.) Without such input from the customer, Sunrich could not properly schedule its production. (*Id.* at 28.)

Nutrisoya's complaints about the untimeliness of orders occurred because there was no compliance with Sections 6.1 and 6.2 and, therefore, Sunrich did not know what Nutrisoya's plans were or how they would fill unplanned orders.

4. <u>**The Absence of an Established Practice or Custom of Ordering and Filling Orders**</u>

There is no evidence that the parties had a practice or custom of ordering and filling orders. The evidence actually shows that Nutrisoya attempted to place orders in various forms, with inconsistent delivery dates, and for irregular quantities. In its discovery responses, Nutrisoya has only been able to identify five purchase orders submitted to Sunrich during the term of the Agreement. (*See* Ex. 2.) Nutrisoya claims that other orders were made by email without a written purchase order. (Ex. 14.)

The testimony of Susan Cote, Nutrisoya's orders desk supervisor, demonstrates that there was no established practice for scheduling and submitting orders to Sunrich. Ms. Cote explained at her deposition that sometimes Nutrisoya asked Sunrich for a confirmation of a production date and sometimes it did not.  (Ex. 15, Cote Dep., at 17.) Nutrisoya did not always speak with Sunrich about scheduling to determine production availability prior to sending purchase orders or emails requesting production.  (*Id.* at 20.) Ms. Cote discussed how, in one case, Nutrisoya modified an order by lowering the number of cases requested to reduce inventory.  (Ex. 16; Ex. 15, at 25.)  Ms. Cote also testified that although she was in charge of orders until May 2005, she never sent a Section 6.1 forecast to Sunrich with three-month projections, nor did she ever send a monthly plan confirming the next month's order, as required by Section 6.2 of the Agreement.  (Ex. 15, at 28.)

Instead, as admitted by its Canadian counsel, Nutrisoya failed to follow the planning and scheduling guidelines set forth in the Agreement.  This noncompliance with the Section 6.1 and 6.2 obligations led to uncertainty and disorder in the ordering and filling of orders.  There was no consistency in Nutrisoya's requests for production of the Product.  This breach by Nutrisoya excused Sunrich from filling Nutrisoya's unbudgeted orders.

### 5.   <u>No Modification or Waiver of the Paragraph 6 Requirements</u>

Moreover, the parties never orally modified the Agreement and, importantly, never modified the Agreement by a writing signed by both parties as required by the

Agreement.  Importantly, the parties never entered into a subsequent written agreement to modify or waive the requirement that Nutrisoya submit a manufacturing and packaging projection forecast or confirmation plan.   Similarly, Sunrich never orally agreed to modify or waive this requirement or any other provision in the Agreement.   (Jenkins Decl. ¶ 7.)

Sunrich never gave consent to Nutrisoya to ignore the Paragraph 6 requirements. In fact, Sunrich clearly explained to Nutrisoya in a letter how its failure to follow those requirements hindered production scheduling:   "Because Nutrisoya never honored the agreed upon obligation to provide an accurate 'monthly manufacturing and production plan' and a 'written plan confirmation' as required by paragraphs 6.1 and 6.2 of the agreement, it has been very difficult to schedule production for the few infrequent orders you have sent in the past."  (Ex. 17.)

**6.     Nutrisoya Did Not, and Could Not, Renew the Agreement Term**

Although Nutrisoya contends that it is entitled to damages beyond the expiration of the term of the Agreement (April 1, 2007), on no occasion did Nutrisoya provide notice of renewal, let alone provide notice six months prior to the Agreement's expiration as required by Section 20.2 of the Agreement.   Even if notice had been given, by the terms of the Agreement, Nutrisoya could not have renewed the Agreement because it did not purchase, on average, at least 5,000 cases of the Product in the 12 months preceding the latest time to give notice, October 1, 2006 (six months prior to the expiration date of April 1, 2007).   (Ex. 1, § 20.2.)   During that time (November 2005 through October

2006), Nutrisoya ordered zero cases total for a monthly average of zero cases.  (*See supra* Table A.)  Even taking the highest possible 12-month period of ordering for Nutrisoya (August 2004 through July 2005), Nutrisoya did not average orders of at least 5,000 cases of the Product per month (59,640 cases total for a monthly average of 4,970 cases).[4]  (*Id.*)

Finally, the undisputed facts demonstrate that the relationship between the parties was extremely strained by December 27, 2005, when Nutrisoya's Minnesota counsel sent a letter to Mr. Jenkins of Sunrich, alleging "substantial consequential damages incurred by Nutrisoya, if Sunrich does not perform."  (Ex. 18.)  There is no evidence that indicates that Sunrich would not have given notice of nonrenewal six months prior to the expiration of the term of the Agreement.  The expert report of John Ruelle and the Affidavit of Kim Jenkins explain that had Nutrisoya not canceled the Agreement in early 2006, Sunrich would have provided notice of nonrenewal of the Agreement by July 1, 2006.  (Ex. 5, at 5-6; Jenkins Decl. ¶ 8.)  Under Section 20.3 of the Agreement, this notice of nonrenewal would have prevented the automatic renewal of the Agreement for a one-year term.

## ARGUMENT

### I.  Summary Judgment Standard

The court may grant a motion for summary judgment by the defendant if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

---

[4] The August 2004 through July 2005 period cannot be used to trigger renewal of the Agreement because it is undisputed that Nutrisoya did not give notice of renewal in August 2005 (or at any other time).

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.  A moving party always bears the burden of informing the court of the basis of its motion. *Celotex*, 477 U.S. at 323.

Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of *some* alleged factual dispute." *Anderson*, 477 U.S. at 247 (emphasis original).  The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Id.* at 256.

The facts are undisputed as to the applicable contract language, including the long-term and short-term planning requirements, at issue in this case.  In addition, the facts are undisputed as to Nutrisoya's failure to follow those requirements.  Because Nutrisoya materially breached the Agreement prior to any alleged breach by Sunrich, Nutrisoya's case should be dismissed with prejudice.  In addition, the facts are undisputed that Nutrisoya did not, and could not, renew the Agreement term three years beyond its expiration on April 1, 2007.  Therefore, any claims for damages beyond April 1, 2007, should be dismissed.

## II.     Nutrisoya's Prior Material Breach of the Agreement Excused Any Further Performance by Sunrich

### A.     Nutrisoya Breached the Agreement by Failing to Provide a Manufacturing and Packaging Projection Forecast and Written Confirmation Plan

Contrary to the undisputed evidence and applicable Minnesota law, Nutrisoya alleges that Sunrich breached the Agreement by failing to manufacture and package 10,000 cases of the Product ordered by Nutrisoya.  Yet, the evidence demonstrates that Nutrisoya materially breached the Agreement by failing to submit Paragraph 6 Forecasts prior to any alleged breach by Sunrich.  Under these circumstances, Nutrisoya may not seek damages from Sunrich for breach of contract.

Prevailing precedent dictates that a party that has materially breached a contract cannot enforce its provisions against another, as a material breach of contract by the first party excuses the second party from performance as a matter of law.  *Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 534 (Minn. 2003) (noting that breaching party cannot set up other party's subsequent breach to excuse its own liability for damages);[5] *Conroy v. Book Automation, Inc.*, 398 N.W.2d 657, 660 (Minn. Ct. App. 1987); *Melford Olsen Honey, Inc. v. Adee*, 452 F.3d 956, 965 (8th Cir. 2006) (under Minnesota law, uncured breach excuses nonbreaching party's performance under contract); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 959 (D. Minn. 2000)

---

[5] Under the Agreement's choice of law provision, Section 22.10, Minnesota law applies:  "This Agreement, its interpretation and its application are governed by the laws in force in the domicile of the defendant [Minnesota] . . . ."

(under Minnesota law, given plaintiff's own breach of agreement, defendant excused from performing its future contractual obligations).   This elementary juridical tenet precludes Nutrisoya from declaring any breach of the Agreement by Sunrich.

Plain and unambiguous terms of the Agreement expressly bound Nutrisoya to provide Sunrich with a written, monthly, long-term manufacturing and packaging projection forecast for the Product, as well as a written, short-term plan confirmation 21 days prior to the beginning of each month for the duration of the Agreement.  (*See* Ex. 1, §§ 6.1, 6.2.)   Nutrisoya cannot deny that the Agreement contained such an explicit requirement.

Moreover, this requirement was a material term of the Agreement.  A breach is material if it defeats one of the primary purposes of the contract.  *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1058 (8th Cir. 2006) (holding that such jury instruction, viewed in light of Minnesota law, was fair and accurate); *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006).  The Agreement states that the Paragraph 6 Forecasts provide the basis for the manufacturing and packaging of the Product.  (Ex. 1, § 5.1.)  Moreover, the Agreement explicitly states that the purpose of the monthly production plan requirement was to ensure that Sunrich could (1) plan its short-term operations and (2) serve the interests of Nutrisoya and its customers more adequately.  (*See* Ex. 1, § 6.2.)  This language makes clear that the primary purpose of the monthly production plan was to allow Sunrich to schedule production in a manner that would serve Nutrisoya's needs.   The forecasts were the governing instruments for

allocating Sunrich's production capacity and establishing schedules, due dates, and quantities of the Product.

Absent Nutrisoya's compliance with this requirement, Sunrich could not ensure that Nutrisoya would receive the quantity of the Product requested for a given installment in the timeframe requested, which was one of the primary purposes of the Agreement. Hence, any breach of this requirement to submit a written plan by Nutrisoya would have been a material breach.

As illustrated by the undisputed facts and Nutrisoya's admission in its interrogatory answers, Nutrisoya committed such a material breach. By its own admission, Nutrisoya never submitted *any* production forecast, written or otherwise, as required by the Agreement. (*See* Ex. 4, No. 16.) Consistent with governing precedent, Nutrisoya's repeated and admitted violation of the Paragraph 6 Forecasts requirement under the Agreement placed Nutrisoya in such a degree of default that it was, and is, prohibited from declaring any breach of the Agreement by Sunrich. *Home Ins. Co.*, 658 N.W.2d at 534; *Conroy*, 398 N.W.2d at 660; *Melford Olsen*, 452 F.3d at 965; *Parkhill*, 174 F. Supp. 2d at 959.

## B.   Sunrich Never Waived the Requirement That Nutrisoya Provide It with a Budget Production Forecast

Sunrich never modified or waived the requirement that Nutrisoya provide it with the Paragraph 6 budget production forecasts. The Uniform Commercial Code ("UCC") requires enforcement of written contract provisions prohibiting modification except by a signed writing. Minn. Stat. § 336.2-209(2). The Agreement specifically makes

ineffective modification to the Agreement or waiver of a right arising therefrom unless such modification or waiver is evidenced in a writing signed by both parties.  (Ex. 1, § 22.5.)   Section 22.6 states that the "fact that a party does not require the full performance of a covenant contained in this Agreement . . . shall not be construed as a waiver of such right or of the full performance of this covenant in the future."  (Ex. 1, § 22.6.)  A waiver by a party is only valid if it is evidenced in writing and only in respect of the rights and circumstances specifically contemplated in the waiver.  (*Id.*)  The only exception is if it is "expressly stipulated to the contrary" that a writing is not required. (*Id.*)

The evidence demonstrates that the Agreement was never modified through a writing signed by both parties.  Moreover, there was no writing that explicitly allowed Nutrisoya not to follow its Paragraph 6 written plan requirements, nor did the parties ever explicitly stipulate that a writing was not required to waive or modify the Paragraph 6 written plan requirements.  Finally, Sunrich never orally told Nutrisoya that Sections 6.1 and 6.2 did not have to be followed.

Waiver of the terms of a contract under Article 2 of the UCC is to be determined by the case law of the applicable jurisdiction.  Minn. Stat. § 336.2-209(4), cmt.  Waiver can only be found where the benefited party voluntarily and intentionally relinquishes a known right, and courts may infer waiver by conduct.  *Montgomery Ward & Co. v. County of Hennepin*, 450 N.W.2d 299, 304 (Minn. 1990).  Waiver must be manifested in

some unequivocal manner, and the burden of proving it rests squarely on the party asserting it. *In re Digital Res., LLC*, 246 B.R. 357, 370 (B.A.P. 8th Cir. 2000).

It simply cannot be said that Sunrich voluntarily and intentionally relinquished its right to receive the Paragraph 6 Forecasts. Sunrich did not ignore the condition that Nutrisoya provide it with a manufacturing and packaging projection forecast, as well as a written confirmation plan for a subject month. When Nutrisoya's sporadic orders began to increase, Sunrich specifically requested a long-range production forecast. (Ex. 12.) Sunrich's pursuit of a long-range forecast of Nutrisoya's production needs precludes any finding that Sunrich intended to relinquish its right to a forecast. It is Nutrisoya's burden to prove waiver, and Nutrisoya cannot point to any facts indicating an unequivocal abandonment of its right to plan production via the Paragraph 6 Forecasts.

Even to the extent Nutrisoya may argue that Sunrich's occasional willingness to spot-fill sporadic and unbudgeted orders could be construed as an intention to waive its right to demand a budget production forecast before every order, it does not follow that it waived its right to demand such a forecast for all time. To the contrary, the Agreement provides:

> The fact that a party does not require the full performance of a covenant contained in this Agreement or does not exercise one of its rights shall not be construed as a waiver of such right or of the full performance of this covenant in the future. Except if expressly stipulated to the contrary, any waiver by a party of any of its rights shall only be valid if it is evidenced in writing and only in respect of the rights and circumstances specifically contemplated in the waiver.

(Ex. 1, § 22.6.)  As this provision illustrates, Nutrisoya specifically agreed that a failure to require full performance of any covenant contained in the Agreement "shall not be construed as a waiver of such right or of the full performance of this covenant in the future."  Thus, Sunrich was well within its rights under the Agreement to demand that Nutrisoya provide a production forecast even though Sunrich had spot-filled unbudgeted orders in the past.  *See Anoka-Hennepin Educ. Ass'n v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 305 N.W.2d 326, 330 (Minn. 1981) (holding that express language of contract had greater probative value than parties' course of performance); *see also* Minn. Stat. § 336.1-303(e) (where express terms of agreement cannot be read consistently with course of performance, then express terms prevail over course of performance).

The undisputed facts demonstrate that Sunrich did not waive the requirement of the Paragraph 6 Forecasts.  The express language of the Agreement requiring any waiver to be in writing and prohibiting waiver of future performance of a covenant should prevail.

C. **Nutrisoya Improperly Terminated the Agreement Before Sunrich Could Fill Its Order, Excusing Any Alleged Failure of Sunrich to Perform Under the Agreement**

Nutrisoya had no valid justification under the law for terminating the Agreement with Sunrich.  Nutrisoya's early termination was a material breach of the Agreement, excusing Sunrich's performance under the Agreement.  *See Scott-Daniels Props., Inc. v. Dresser*, 160 N.W.2d 675 (Minn. 1968) (unilateral termination of contract caused material breach of contract); *Home Ins. Co.*, 658 N.W.2d at 534 (material breach of

contract by one party excuses other party from performance as matter of law). Therefore, as a matter of law, Nutrisoya's breach of contract claims must be dismissed.

The Agreement falls within the definition of a UCC installment sales contract. Minn. Stat. § 336.2-612(1).[6] Section 2-612 of the UCC, which applies to installment contracts, creates an exception to the "perfect tender rule" otherwise mandated for a single-delivery contract under Section 2-601 of the UCC. Minn. Stat. § 336.2-612(2). Under subsection (2) of Section 2-612, a buyer may not reject nonconforming tender unless the defect substantially impairs the value of the installment. *Id.* In addition, if the nonconformity is curable and the seller gives adequate assurances of cure, the buyer must accept the installment. *Id.* But even if rejection is proper under subsection 2, cancellation of the contract is not appropriate unless the defect substantially impairs the value of the whole contract. Minn. Stat. § 336.2-612(3).

Nutrisoya improperly rejected Sunrich's proposal to deliver the Product in March 2006, which would have constituted a conforming tender under Section 2-612(2). However, even assuming Sunrich's failure to supply conforming goods based on the timeliness of delivery, any alleged nonconformity did not substantially impair either (1) the value of that installment or (2) the value of the contract as a whole. Thus, Nutrisoya was not justified in canceling the contract.

---

[6] The Minnesota version of the UCC defines an "installment contract" as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent." Minn. Stat. § 336.2-6(1).

1.   **Nutrisoya Improperly Rejected Sunrich's March 2006 Production Date as Nonconforming**

Even if Nutrisoya could prove (which, respectfully, it cannot) that Sunrich's failure to deliver the goods by December 30, 2005, constituted a defect with respect to that installment, the alleged delay in delivery did not substantially impair the value of the installment.   As previously noted, the buyer may reject an installment under Section 2-612 only if the defect substantially impairs the value of the installment.  *Id.* Although a late delivery may constitute a nonconformity, a buyer may not reject an installment as nonconforming for late delivery if the delay in delivery did not substantially impair the value of the installment.  *See, e.g., Arkla Energy Res. v. Roye Realty & Developing, Inc.*, 9 F.3d 855 (10th Cir. 1993).

In *Arkla*, the owner and operator of natural gas pipelines entered into an agreement with a producer and supplier of natural gas to produce and supply gas to the pipeline company for a period of two years.  *Id.* at 859.  Under the contract, the gas producer was required to supply the pipeline company with up to 3,000 Mcf (thousand cubic feet) and up to 1.05 Bcf (billion cubic total) over the two-year period.  *Id.*  On December 15, 1989, the plaintiff sent the defendant a letter requesting 3,000 Mcf of gas a day during January 1990.  *Id.*  The plaintiff sent a similar letter on January 19, 1990, requesting the same amount a day for February 1990.  *Id.*  However, the defendant was unable to deliver any gas in January and delivered only 27 percent of the gas in February.  *Id.*  In addition, the defendant failed to tender a daily delivery of gas in October 1989.  *Id.*  Upon failing to deliver gas in January and February, the defendant offered to deliver allotments of gas up

to five times as high as it was obligated to deliver in order to deliver the entire 1.05 Bcf available to the plaintiff. *Id.* The plaintiff rejected this offer and, at the end of the two years, had received only 81 percent of the total gas the parties had nominated. *Id.* The plaintiff sued the defendant for breach of contract, lost the trial, and appealed.

The court of appeals affirmed the trial court based on its finding that (1) the gas producer's offer to increase the amount of gas in each allotment was a valid tender of nonconforming installments and (2) the pipeline company's refusal to accept the late, nonconforming installments was improper because the contract did not make time of the essence; thus, the nonconformity did not substantially impair the value of the installments. *Id.* at 860. The court further found that the late installments did not substantially impair the value of the whole contract. *Id.*

Here, assuming Sunrich's proposed March 2006 production date constituted a late tender for the Order #267 installment (which Sunrich does not concede), such late tender constituted a valid tender of nonconforming installments, and Nutrisoya wrongfully rejected the installment. The Agreement did not make time of the essence; thus, any alleged nonconformity could not have substantially impaired the value of the installment. *See also Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902 (2d Cir. 1985) (finding that buyer was not justified in refusing to accept seller's timely curative shipment of aluminum).

### 2.      Nutrisoya Was Not Justified in Canceling the Contract

Assuming solely for purpose of this argument that (1) Sunrich breached the Agreement by failing to deliver Order #267 by December 30, 2005, and (2) such breach constituted a nonconformity that substantially impaired the value of that installment, such defect did not justify Nutrisoya's *cancellation of the entire contract* insofar as such defect did not substantially impair the value of the entire contract.  "When there is no predicate for finding that the breach substantially impaired the value of the contract, there is no basis for the buyer to repudiate the contract."  *Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc.*, 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995); s*ee also* Minn. Stat. § 336.2-612(3).

Under the circumstances of this case, the allegedly late delivery of one installment did not substantially impair the value of the contract as a whole.  *See, e.g., Emanuel Law Outlines*, 899 F. Supp. at 1087-88 (bar review organizer was not entitled to repudiate sales contract with study aid publisher for publisher's failure to meet deadline with regard to one supplement, insofar as such failure did not amount to "substantial impairment" of whole contract, where publisher provided eight of nine promised outlines on time and supplemented issue was received more than one month before bar exam).  *Cf. Arkla*, 9 F.3d at 855; *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978 (S.D.N.Y. 1985).  Had Nutrisoya not presumptively and wrongfully canceled the contract, Sunrich would have continued to supply the Product in conformance with the Agreement, and Nutrisoya

would not have suffered any substantial or lingering harm from Sunrich's one allegedly late installment. Thus, Nutrisoya's cancellation of the contract was unjustified.

**III.    Sunrich Could Not Breach the Agreement for Late Deliveries Because the Agreement Is Clear That the Forecasts to Be Provided by Nutrisoya Under Paragraph 6 Define the Delivery Times, and Nutrisoya Failed to Establish Those Delivery Times**

Minnesota law provides:  "The time for shipment or delivery or any other action under a contract if not provided in this article *or agreed upon* shall be a reasonable time." Minn. Stat. § 336.2-309(1) (emphasis added).   This statutory provision inserts a reasonable time standard where there is no agreement between the parties as to when deliveries are to be made.   It does not apply here where the parties agreed on the mechanism that would govern the deliveries of the Product:  the Paragraph 6 Forecasts. In Section 5.1, Sunrich covenants to manufacture the Product in accordance with the Manufacturing and Packaging Plan.  The Manufacturing and Packaging Plan, described in Paragraph 6, requires that Nutrisoya define its three-month requirements for manufacturing and packaging, with the next month's requirements confirmed at least 21 days before the beginning of that month.  This three-month forecast, along with a monthly confirmation, is what governs deliveries under the Agreement.

Because the parties agreed that the Paragraph 6 Forecasts would establish delivery times, Minnesota Statutes § 336.2-309 does not apply.   Because Nutrisoya failed to submit its Paragraph 6 Forecasts, Sunrich was not bound to any delivery time.  Therefore, Nutrisoya's breach of contract claim that Sunrich failed or refused to manufacture and

package the Product ordered by Nutrisoya fails as a matter of law.  (*See* Compl. [Docket No. 1] ¶ 30.)

In ascertaining the agreement of the parties under the Minnesota UCC, "(1) express terms prevail over course of performance, course of dealing, and usage of trade; (2) course of performance prevails over course of dealing and usage of trade; and (3) course of dealing prevails over usage of trade." Minn. Stat. § 336.1-303(e)(1)-(3). The Agreement is the best evidence of intent, especially considering that the parties' conduct demonstrates an absence of any established practice or custom of ordering and filling orders.  (*See supra* Facts § B(4).)  At best, Nutrisoya's alleged course of performance under the Agreement is inconsistent with the express terms of the Agreement.  Under the UCC, when the express terms of an agreement cannot be read consistently with the course of performance, the express terms control.  *See* Minn. Stat. § 336.1-303(e).

However, even if the Court were to apply a reasonable time standard, the Agreement itself unequivocally demonstrates that the parties intended a range of three months for deliveries to be made from Sunrich to Nutrisoya.  (Ex. 1, § 6.1.)  "What is a reasonable time . . . depends upon the intention of the parties, as evidenced by the circumstances of the particular case."  *Toresdahl v. Armour & Co.*, 201 N.W. 423, 423 (Minn. 1924).  The intention of the parties, as evidenced by the Agreement itself, is that deliveries must be made within three months, the period that was to be captured in the Paragraph 6 Forecasts.  Nutrisoya had the opportunity to specify earlier deliveries in its

forecast submissions, but never took this opportunity.  Any delivery within three months of the request, therefore, would be reasonable.  Because the undisputed facts demonstrate either that Sunrich delivered the Product within three months of the requests for the Product or that Nutrisoya canceled the contract prior to expiration of the three-month period, there could be no breach of contract for late deliveries.

**IV.**    **The Alleged Failure of Sunrich to Deliver the Product to Nutrisoya Cannot Constitute a Breach of Contract Where Nutrisoya Frustrated a Basic Assumption on Which the Contract Was Made**

Minnesota Statutes § 336.2-615 ("Excuse by Failure of Presupposed Conditions") states, in relevant part:  "Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . ."

The Agreement clearly presupposes that Nutrisoya will provide Paragraph 6 Forecasts prior to any delivery of the Product, and even goes so far as to explain why the short-term plan is needed:  "to enable Sunrich to better plan its short-term operations, including the purchase of Ingredients and Packaging Components."  (Ex. 1, § 6.2.)

The lack of the presupposed condition—the Paragraph 6 Forecasts—resulted in exactly what the parties sought to avoid:  an inability of Sunrich to plan its short-term operations.  Sunrich had booked its plant to capacity with other customers at times when Nutrisoya dramatically increased its unbudgeted demand for the Product.  Mr. Jenkins described the relationship between the parties as "chaotic" because of the absence of the

Paragraph 6 Forecasts.   Mr. Hammer explained how Sunrich could not set aside production time in advance for Nutrisoya without a production forecast.   Although Sunrich made its best efforts to fulfill the Agreement,[7] the absence of the Paragraph 6 Forecasts made it impossible for Sunrich to deliver the Product exactly when Nutrisoya needed it.   Because submission of the Paragraph 6 Forecasts was a basic assumption on which the Agreement was made, Sunrich's alleged failure to deliver the Product on time cannot be the basis for a breach of contract claim.   *See Selland Pontiac-GMC, Inc. v. King*, 384 N.W. 2d 490 (Minn. Ct. App. 1986) (seller's failure to deliver school bus bodies was not breach of contract where supplier's manufacture of bodies was basic assumption on which contract was made and that supplier had ceased manufacture of bodies).

Even if the Court holds that Nutrisoya's failure to submit the Paragraph 6 Forecasts was not a material breach, the submission of the forecasts was a basic assumption on which the contract was based, and, therefore, Sunrich was excused from delivering the Product.

---

[7] The UCC comment describes the excused seller's obligation as follows:   "An excused seller must fulfill his contract to the extent which the supervising contingency permits, and if the situation is such that his customers are generally affected he must take account of all in supplying one."   UCC § 2-615, cmt. 11.

**V.**   **Sunrich Is Entitled to Summary Judgment for Any Claim for Damages Beyond the Term of the Agreement**

    **A.**   **Nutrisoya May Not Recover Future Damages Based on Potential Contract Renewals Because the Recovery of Such Damages Would Contravene Basic Tenets of Contract Law and Is Inherently Speculative**

The gravamen of Nutrisoya's Complaint is that Sunrich breached the Agreement. It is undisputed that the Agreement would have expired on April 1, 2007. Nutrisoya, nevertheless, seeks damages for the years 2007 through 2010, a period that unquestionably extends beyond the expiration of the 2004-2007 Agreement.

The appropriate measure of damages for breach of contract is the amount that will place the plaintiff in the same situation as if the contract had been performed. *Logan v. Norwest Bank Minn., N.A.*, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999); *see also* 4 *Minnesota Practice*, CIVJIG 20.60 (1999) (stating that damages for breach of contract should put nonbreaching party in same position he or she would have been in had contract not been breached). In determining contract damages, an award should not amount to a windfall, *i.e.*, more than the amount the nonbreaching party would have been in had the contract been performed. 4 *Minnesota Practice*, CIVJIG 20.60 (1999). A finding that Nutrisoya is entitled to three years' worth of future damages would put it in a substantially better position than it would have occupied but for the breach—resulting in a windfall to Nutrisoya and violating a fundamental tenet of contract law. *See Mktg. & Mgmt. Info., Inc. v. United States*, 62 Fed. Cl. 126, 131 (2004) ("Because the defendant and plaintiff were only bound for the three-year base period, awarding damages for lost

profits for the two option years would result in putting plaintiff in a better position than had the agency simply completed its three-year obligation."); E. Allan Farnsworth, *Farnsworth on Contracts* § 12.8 ("It is a fundamental tenet of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed.").

Moreover, Nutrisoya's claim that it is entitled to three years' worth of future damages is fatally speculative because the claim is premised on the hypothetical circumstance that Sunrich would have renewed Nutrisoya's contract for additional terms. *Mktg. & Mgmt. Info.*, 62 Fed. Cl. at 130 ("We believe breach damages for the two option years would be inherently speculative"). In this case, Nutrisoya had the option to renew the contract only *if* it purchased, on average, at least 5,000 cases of the Product per month in the 12-month period prior to the notice of renewal. Yet, the evidence indisputably shows that Nutrisoya did not average 5,000 cases purchased per month during any 12-month period during the term. Based on this evidence, Nutrisoya could not have renewed the Agreement term.

Moreover, it is undisputed that Nutrisoya never gave notice of renewal of the Agreement during its term. The claim that Nutrisoya would have renewed but for Sunrich's alleged breach is pure conjecture. *Cf. Helvering v. Kansas City Am. Ass'n Baseball Co.*, 75 F.2d 600, 604 (8th Cir. 1935) (finding if option to renew is qualified, power to renew is not absolute); *Heflebower v. Sand*, 71 F. Supp. 607, 614 (D. Minn. 1947) ("'To recover prospective profits as damages for a breach of contract, it must

appear . . . that the anticipated profits *did not depend on contingencies*, but were reasonably certain to accrue if the contract had not been breached . . . .'" (emphasis added; citation omitted)).  For Nutrisoya to arbitrarily presume the continuation of the contract for an additional three years is contrary to the evidence and results in damages claims that are far too speculative and imaginary to pass muster under Minnesota law. *Hinz v. Neuroscience, Inc.*, 538 F.3d 979 (8th Cir. 2008); *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977) (holding that "'damages which are speculative, remote, or conjectural are not recoverable'" and requiring plaintiff to set forth "a reasonable basis upon which to approximate the amount" of damages (citation omitted)); *see also Dunlap v. Alcuin Montessori Sch.*, 698 N.E.2d 574, 576 (Ill. App. Ct. 1998) (denying plaintiffs' claim for damages based on any potential renewal of automatically renewable contract); *Nike Int'l, Ltd. v. HDS Mfg. Mktg. & Distrib. of Sports Prods.*, Civ. No. 86-1395-FR, 1988 WL 141555, at *9 (D. Or. Dec. 20, 1988) (barring as speculative damages premised on renewal of contract for additional five-year term).

To allow Nutrisoya to recover damages for the three years after the Agreement expired in April 2007 would place Nutrisoya in a better position than if Nutrisoya had not unilaterally terminated the contract in early 2006—a result that would not only contravene Minnesota law, but would also contravene the basic tenets of contract law. Nutrisoya's damages must be limited to what is actually recoverable under the law.  This calculation does not encompass damages beyond the three-year term of the Agreement.

Accordingly, Nutrisoya's claim for damages for the period 2007-2010 should be dismissed as a matter of law.

**B.**   **Nutrisoya Has No Evidence to Support a Claim for Damages with Reasonable Certainty Beyond the Three-Year Term of the Contract**

Even if Nutrisoya could show, beyond mere speculation and conjecture, that the Agreement would have been renewed for another three-year term (which it cannot), it has no evidence to support such a tenuous claim.  Where a plaintiff fails to set forth evidence establishing its damages (an essential element of its claim), a court should enter summary judgment against the plaintiff on that claim.  *St. Hilaire v. Minco Prods., Inc.*, 288 F. Supp. 2d 999, 1010-11 (D. Minn. 2003) (granting summary judgment on breach of contract claim based on lack of proof of damages).

Nutrisoya *cannot* show that the price of the Product would not have increased during any additional term.  To the contrary, under the Agreement, Sunrich could have and would have increased the price for the Product because of Sunrich's increased costs of ingredients, packaging, labor, storage, handling, and loading.  Section 10.2 of the Agreement allows Sunrich to increase prices based on increased costs.  (*See* Ex. 5, at 7-10; Jenkins Decl. ¶ 9; Ex. 1, § 10.2.)  Absent evidence supporting Nutrisoya's future contract damages with any reasonable certainty beyond April 2007, summary judgment should be entered in favor of Sunrich on this claim.

## CONCLUSION

For the above reasons, Sunrich respectfully requests that the Court grant its motion for summary judgment and dismiss Nutrisoya's complaint with prejudice.   In the

alternative, Sunrich respectfully requests that the Court dismiss Nutrisoya's claims for damages suffered after the expiration of the Agreement's term on April 1, 2007.

Respectfully submitted,

**STOEL RIVES LLP**

Dated:  February 27, 2009

_____s/ Steven R. Kluz_____
Eric A. Bartsch (#243723)
Steven R. Kluz (#286588)
33 South Sixth Street, Suite 4200
Minneapolis, MN  55402
Telephone:  612-373-8800
Facsimile:   612-373-8881
eabartsch@stoel.com
srkluz@stoel.com

**ATTORNEYS FOR DEFENDANT**