UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nutrisoya Foods Inc.,
a Canadian Corporation,

        Plaintiff,

  v.                          **MEMORANDUM OPINION**
                                   **AND ORDER**
Sunrich, LLC, d/b/a              Civil No. 08-25 ADM/AJB
Sunrich Foods, Inc.,
a Minnesota limited liability company,

        Defendant.

___

Donald S. Arbour, Esq., Arbour Law Firm, Minneapolis, MN, argued on behalf of Plaintiff.

Eric A. Bartsch, Esq., Stoel Rives LLP, Minneapolis, MN, argued on behalf of Defendant.

___

## I. INTRODUCTION

On April 24, 2009, the undersigned United States District Judge heard oral argument on Defendant Sunrich, LLC's ("Sunrich") Motion for Summary Judgment [Docket No. 27] on Count One of Plaintiff Nutrisoya Foods, Inc.'s ("Nutrisoya") Complaint alleging breach of contract [Docket No. 1].[1] Sunrich seeks summary judgment arguing that principles of contract law excuse Sunrich from timely performing under the contract. Def.'s Mem. in Supp. of Summ. J. [Docket No. 29] at 1-2, 18-31. Alternatively, Sunrich urges the Court to dismiss Nutrisoya's claim for damages allegedly incurred after the expiration of the contract's initial term on April 1, 2007. Id. at 2, 32-35. For the reasons stated below, Defendant's Motion is denied in part and granted in part.

---

[1] Nutrisoya's Complaint also included a count for breach of the covenant of good faith and fair dealing, which has been dismissed. See Order Granting Def.'s Mot. to Dismiss Count II, Mar. 14, 2008 [Docket No. 13].

## II. BACKGROUND[2]

This case concerns a Manufacturing and Packaging Agreement (the "Agreement") between Nutrisoya, a Canadian corporation which sells rice-based beverage products to retailers, and Sunrich, a Minnesota company which produces and packages a variety of food products, including rice-based beverages. See Kluz Decl. [Docket No. 31] Ex. 1. The Agreement provided that Sunrich manufacture and package an organic rice-based beverage product (the "Product") according to Nutrisoya's specifications. Id. at ¶ 5.1. Sunrich was also obligated to deliver the Product from its aseptic packaging facility in Alexandria, Minnesota to Nutrisoya's warehouse in Montreal, Quebec. Id. at ¶ 9.1. The Agreement's initial term spanned from April 1, 2004 to April 1, 2007 and was subject to automatic renewal if Nutrisoya met a specified minimum purchase requirement. Id. at ¶¶ 20.1-20.3.

Paragraph 6 of the Agreement contemplated that Nutrisoya would provide Sunrich with long and short-term projections of Nutrisoya's production needs (the "Paragraph 6 requirements" or "Paragraph 6 forecasts"). That provision stated:

> 6. MANUFACTURING AND PACKAGING PLAN
>
> 6.1 Nutrisoya covenants to transmit in writing to Sunrich, as required by Sunrich, a monthly manufacturing and packaging projection plan for the Product, for a period of three consecutive months.
>
> 6.2 At least 21 days before the beginning of each month, Nutrisoya shall transmit to Sunrich, for its approval, a written plan confirmation for the subject month to enable Sunrich to better plan its short-term operations, including the purchase of Ingredients and Packaging Components, as the case may

---

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

> be, and to serve the interests of Nutrisoya and its customers
> more adequately.

Id.

During the first year and a half of the Agreement, the actual conduct of the parties did not conform to this provision. Instead of providing long-term monthly packaging plans and short-term written plan confirmations, Nutrisoya contacted Sunrich by telephone or e-mail to inform Sunrich of its Product needs and arrange for a production date. Arbour Decl. [Docket No. 34], Ex. 3 (Cote Dep.) at 11-20. Nutrisoya then sent a purchase order or e-mail confirming the request, and Sunrich filled the order. Id. A minimum of ten transactions occurred between the parties during the first eighteen months of the contract. Kluz Decl., Ex. 4 (Pl.'s Answers to Interrogs.) at 3-4; Arbour Decl., Ex. 8 (Def.'s Answers to Interrogs.) at No. 5.

During this initial period, Sunrich does not appear to have insisted that Nutrisoya satisfy the Paragraph 6 requirements before filling Nutrisoya's orders. However, Sunrich did request production forecasts on two occasions. The first request was on January 25, 2005, when Sunrich's Production Manager, Neil Hammer ("Hammer"), responded to Nutrisoya's requests for Product in February and April. Arbour Decl., Ex. 9 at 121. Hammer asked Nutrisoya to "confirm your need for production in February and March." Id. Nurisoya e-mailed a response confirming 10,000 cases of Product for production the week of February 21 and 10,000 cases for the week of April 1, and inquired as to how long it should wait before advising of additional production needs. Id. at 120. The record does not show that Hammer requested any additional information upon receiving this response. The second request for a production forecast was made by Hammer to Nutrisoya's Production Director Luc Roy ("Roy") on May 5, 2005. Id. at 124. Roy had sent Hammer an e-mail earlier that day requesting 10,000 cases of Product in early

3

June. Id. Hammer replied by informing Roy that production would be available June 20, and then added, "It appears that your production needs are increasing. Do you have a long range forecast that you could share?" Id. Roy answered, "For your question about the forecast for the next month, we will need a production in the middle of July and I think that we need 5000 cs of original and 5000 cs of Vanilla depending on sale statistics." Id. at 123. Hammer replied, "Please send the PO to me and I will forward to the proper personnel." Id.

In late September 2005, Nutrisoya advised Sunrich that it anticipated its business to more than double as a result of Nutrisoya's business relationship with Canada's largest grocer. Arbour Decl., Ex. 10 at 127. During this same time period, Sunrich's parent company, SunOpta, announced its procurement of a three-year exclusive contract with a major global retailer for the production and packaging of a soymilk beverage. Id., Ex. 5 (Jenkins Dep.) at 40-41. Production was to begin in mid-December, 2005 at Sunrich's Alexandria, Minnesota facility. Id. at 40.

On October 25, 2005, Nutrisoya submitted Purchase Order No. 266 for 20,000 cases of Product with a requested delivery date of December 31, 2005. Kluz Decl., Ex. 2 at 185. The Purchase Order was revised the next day to reflect that 10,000 cases of Product would be delivered November 24, 2005. Id. at 186-87. Purchase Order No. 267 was created for the remaining 10,000 cases, which were to be delivered December 30, 2005. Id. at 188. The named contacts on the Purchase Orders were Hammer and Roy. There is no evidence that Sunrich mentioned or requested production forecasts at the time of the October orders. Sunrich filled Purchase Order No. 266, which had a delivery date of November 24, 2005, by the middle of November. Karass Aff. [Docket No. 35] at ¶ 4.

In late November, 2005, Kim Jenkins ("Jenkins"), Sunrich's Vice President of Sales and

4

Marketing, called Larry Karass ("Karass"), Vice President of Sales for Nutrisoya, and informed him that Sunrich might be discontinuing its rice milk business and might be unable to continue providing Product to Nutrisoya. Arbour Decl., Ex. 1 (Karass Dep.) at 73. Nutrisoya repeatedly requested a telephone conference call with Sunrich to discuss this issue. Id., Ex. 11 at SR000038-39. The record does not reflect that such a conference ever took place.

On December 9, 2005, Nutrisoya inquired as to the status of Purchase Order No. 267, which had been placed on October 26, 2005 for 10,000 cases of Product to be delivered December 31, 2005. Arbour Decl., Ex. 11 at 139. Sunrich informed Nutrisoya that production was unavailable in December. Id. On December 9 and December 21, 2005, Nutrisoya inquired as to a revised production date. Id. at 144-146. In its December 21 request, Nutrisoya informed Sunrich that it would be out of stock within two weeks. Id. at 146. Jenkins responded by e-mail on December 22, 2005, stating, "This is to confirm that [P]roduct would be available for pickup in Quebec City towards the first weeks of March." Id. at 148. Nutrisoya informed Sunrich that this date was unacceptable, as Nutrisoya's inventory of Product was exhausted. Id. Sunrich then suggested that Nutrisoya use manufacturer Soylutions in Quebec City as an alternate supply source for the Product. See id., Ex. 12 at 155-156. Nutrisoya rejected this option, noting that Soylutions's facility was not equipped to meet Nutrisoya's Product specifications.[3] Id. at 155. A week later, Sunrich informed Nutrisoya that it had located another packaging facility to manufacture the Product, but would not disclose the identity of the alternate manufacturer. Id. at 159. At this point, Nutrisoya contracted with California Natural Products to manufacture a

---

[3] Nutrisoya indicated that "Soylutions does not have access to the same packaging format, does not have ready formulation, is not certified kosher," and would not be capable of providing Product to Sunrich for at least four months. Id. at 155.

5

similar product. Karass Aff. at ¶ 6. Purchase Order No. 267 was never filled by Sunrich. See id. at ¶¶ 4-5.

## III. DISCUSSION

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B. Sunrich's Contract Law Arguments

#### 1. Prior Breach

Sunrich alleges that Nutrisoya first breached the Agreement by failing to supply the long and short-term forecasts required by Paragraph 6. Sunrich argues this prior breach by Nutrisoya excused Sunrich from fulfilling its contractual obligation to manufacture the Product requested in Purchase Order No. 267. Def.'s Mem. in Supp. of Summ. J. at 1-2, 18-31. The "prior breach" doctrine recognizes that the non-performance of one party under a contract excuses the future

6

contractual obligations of the other party. Home Ins. Co. v. Nat'l. Union Fire Ins. of Pittsburgh, 658 N.W.2d 522, 534 (Minn. 2003); Melford Olsen Honey, Inc. v. Adee, 452 F.3d 956, 965 (8th Cir. 2006); Parkhill v. Minnesota Mut. Life Ins. Co., 174 F. Supp. 2d 951, 959 (D. Minn. 2000).

### a. Waiver

Nutrisoya rebuts Sunrich's prior breach argument by positing that it did not breach the Agreement because Sunrich's repeated conduct in filling orders without requesting the Paragraph 6 forecasts constituted Sunrich's waiver of those requirements. Sunrich denies waiving the Paragraph 6 requirements and cites language in the Agreement specifically prohibiting waiver or modification of the Agreement except in writing.[4]

The Minnesota Supreme Court has recently addressed the issue of whether a contract term requiring changes to be made in writing will preclude a party's conduct from constituting a waiver. Valspar Refinish, Inc. v. Gaylord's, Inc., ___ N.W.2d ___, Civ. No. A06-2227, 2009 WL 1077437 (Minn. April 23, 2009). Generally a sales contract requiring all changes to be in

---

[4] The relevant provisions of the Agreement concerning modification and waiver read:

> 22.5 Any modification to this Agreement or waiver of a right arising therefrom shall be without effect unless it is evidenced in a writing signed by the parties.
>
> 22.6 The fact that a party does not require full performance of a covenant contained in this Agreement or does not exercise one of its rights shall not be construed as a waiver of such right or the full performance of this covenant in the future. Except if expressly stipulated to the contrary, any waiver by a party of any of its rights shall only be valid if it is evidenced in writing and only in respect of the rights and circumstances specifically contemplated in the waiver.

Kluz Decl., Ex. 1 at 118.

7

writing is enforceable, however, an exception is recognized where an attempt to modify or rescind may operate as a waiver. Id. at *5 (citing Minn. Stat. § 332.2-209(2) and (4)). "Under subsection 2-209(4), parties to a sales contract may waive a requirement that any changes to the contract must be in writing and, as a result, waive other contractual requirements without written agreement." Id. The purpose behind the exception contained in § 2-209(4) is "to prevent contractual provisions excluding modification except by signed writing from limiting in other respects the legal effect of the parties' actual later conduct." Minn. Stat. § 336.2-209, Cmt. 4. "This exception is narrow, however, and any waiver under subsection 2-209(4) must satisfy the rules and principles of Minnesota law regarding waiver." Valspar, 2009 WL 1077437 at *5.

Under Minnesota law, waiver is defined as "the intentional relinquishment of a known right." Id. at *6 (citations and quotations omitted). "Ignoring a provision in a contract will constitute waiver if the party whom the provision favors continues to exercise [its] contract rights knowing that the condition is not met." Patterson v. Stover, 400 N.W.2d 398, 400 (Minn. Ct. App. 1987). "The intent to waive need not be shown through an express declaration or agreement. Such intent may be inferred, instead, where a party knows of its rights yet continues to recognize the contract as binding." Klosek v. American Express Co., Civ. No. 08-426, 2008 WL 4057534, at *14 (D. Minn. Aug. 26, 2008). Minnesota courts thus look to party conduct to determine whether it is reasonable for one party to conclude, based on the conduct of the other party, that a provision of the contract has been waived. See, e.g., Fischer v. Pinske, 243 N.W.2d 733, 735 (Minn. 1976) (finding that parties' actions and inactions provided reasonable inference of waiver). Whether a party's conduct constitutes a waiver is a fact question and depends on the circumstances involved in each case. Farnum v. Peterson-Biddick Co., 234 N.W. 646, 647

(Minn. 1931); <u>Klosek</u>, 2008 WL 4057534 at *15; <u>Valspar</u>, 2009 WL 1077437 at *5.

The circumstances here present a genuine issue of fact as to whether Sunrich's conduct constituted a waiver of the Agreement's Paragraph 6 requirements. When viewing the facts in the light most favorable to Nutrisoya, a reasonable jury could find that Sunrich intentionally relinquished its known right to require Paragraph 6 forecasts under the Agreement. Sunrich's Neal Hammer was often involved in receiving and scheduling Nutrisoya's request for Product, and it is reasonable to conclude that as Production Manager, he had knowledge of the Paragraph 6 requirements. Whether Sunrich relinquished its right to require the Paragraph 6 forecasts, based on Sunrich's repeated filling of Nutrisoya's orders in the absence of such forecasts, and the apparent acceptance of Nutrisoya's responses to Sunrich's two requests for long range forecasts, requires a factual, not a legal, determination. Further, Sunrich did not notify Nutrisoya that it was in default for failure to provide the Paragraph 6 requirements,[5] nor did it make mention of the requirements until January 16, 2006, when Sunrich's Jenkins raised the issue in a letter to Nutrisoya's counsel. Arbour Decl., Ex. 17 at 154. The letter was written nearly three

---

[5] The Agreement sets forth the procedure to be used when one party chooses to enforce an obligation which has not been fulfilled by the other party:

13. DEFAULT

Each of the following events shall constitute a default:
. . .

13.7 A party does not fulfill one of its obligations or does not observe one of its covenants under this Agreement and this situation has not been remedied within 15 business days of the transmittal of a notice to this effect by the other party.

Kluz Decl., Ex. 1 at 110.

9

months after Nutrisoya had placed its most recent (and what was to be final) request for Product. Thus, the parties' course of conduct raises fact issues as to whether Sunrich waived the Paragraph 6 requirements.

Sunrich further responds that even assuming it waived the Paragraph 6 requirements, Jenkins' January 16, 2006 letter constituted a withdrawal of the waiver. Minnesota law provides that:

> A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Minn. Stat. 336.2-209(5). While no published Minnesota decisions address this statutory provision, other courts interpreting identical provisions have held that a party which has previously waived a contract requirement may only withdraw the waiver after reasonable notification, and may not retract a waiver if the other party has materially changed its position in reliance on the waiver. Gillani Consulting, Inc. v. Daewoo Heavy Inds. Am. Corp., Civ. No. C05-0823, 2006 WL 3545467, *11 (W.D. Wash. Dec. 7, 2006). This is often a question of fact for the jury. See N.J. Collins, Inc. v. Pacific Leasing, Inc., Civ. No. A.97-2379, 1997 WL 786239, *5 (E.D. La. Dec. 19, 1997) (denying summary judgment due to fact issues of whether waiver had occurred or had been validly retracted); PC COM, Inc. v. Proteon, Inc., 946 F. Supp. 1125, 1133 (S.D.N.Y. 1996) (finding fact issues as to whether defendant's communications were "reasonable notification" and whether withdrawal of waiver worked an injustice.).

Here, even if Sunrich's January 16, 2006 letter were interpreted as a notice of its withdrawal of the waiver, the notice would have been given more than two months after

10

Nutrisoya had placed its order for Product, and nearly a month after Nutrisoya's December 21, 2005 e-mail informing Sunrich that it would be out of stock within two weeks.  Given these facts, a jury could find that Sunrich did not give reasonable notification of its intent to rescind the waiver.  Thus, the issues of whether Sunrich waived the Paragraph 6 requirements or properly rescinded any such waiver-issues raised by Nutrisoya in defense of Sunrich's prior breach argument-are fact questions to be resolved by a jury, and are not appropriate for summary judgment.

### b.  Materiality of Breach

Nutrisoya additionally urges that even if the Paragraph 6 requirements were not waived, Nutrisoya's failure to provide the Paragraph 6 forecasts was not a material breach of the contract.  Under the prior breach doctrine, the breach by the first party must be material and uncured to excuse the second party from performance.  Home Ins. Co., 658 N.W.2d at 534 (citing Restatement (Second) of Contracts § 237 (1981)).  A breach is material if it is "significant enough to permit the aggrieved party to elect to treat the breach as total (rather than partial), thus excusing that party from further performance and affording it the right to sue for damages."  Sitek v. Striker, ___ N.W.2d ___, 2009 WL 1119014 at *6 (Minn. Ct. App. Apr. 28, 2009) (quoting Black's Law Dictionary and finding that while a delay in a single installment payment is not a material breach, the failure to make payments for more than three years constitutes a breach).  "Whether an act or omission constitutes a material breach of a contract is a fact question." Id. at *6.  See also Juvland v. Plaisance, 96 N.W. 2d 537, 542 (Minn. 1959) (denying summary judgment where a fact question existed as to whether an insured's breach of a cooperation clause was "substantially material under all the facts and circumstances"); Melford,

452 F.3d at 965 (finding district court properly submitted factual questions to jury regarding whether both parties breached and when those breaches occurred).

The facts of the instant case raise the genuine issue of whether Nutrisoya's failure to provide Paragraph 6 forecasts was a material, uncured breach. Nutrisoya's failure in October to provide a three-month forecast under Paragraph 6.1 may not have been material in light of Sunrich's inability to make Product available until four months later. Additionally, Nutrisoya's October Purchase Order No. 267 may have satisfied or cured the short-term forecasting requirement of Paragraph 6.2. That Paragraph required Nutrisoya to provide "[a]t least 21 days before the beginning of each month . . . a written plan confirmation for the subject month." Kluz Decl., Ex. 1 at ¶ 6.2. The October 26 Purchase Order essentially communicated Nutrisoya's December production needs at least 21 days before the "subject month" of December. In light of these fact issues, Sunrich's request for summary judgment on the issue of prior breach must be denied.

### 2. Nonoccurrence of a Presupposed Condition

Sunrich also argues that the Agreement was based upon the presupposed condition that Nutrisoya would provide it with Paragraph 6 forecasts, and that Nutrisoya's failure to satisfy this condition resulted in Sunrich's inability to perform under the Agreement. To support this argument, Sunrich relies on Minn. Stat. § 336.2-615 (Excuse by Failure of Presupposed Conditions"), which states in relevant part: "Delay in delivery in whole or in part by a seller . . . is not a breach of duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption under which the contract was made."

The statute is a codified and less stringent version of the common-law defense of impossibility of performance. Barbarossa and Sons, Inc. v. Iten Chevrolet, Inc., 265 N.W.2d 655, 658-59 (Minn. 1978). The statute is generally applied to situations where an agreement between parties is based on the occurrence of a contingency beyond the control of the parties and that contingency fails to occur.[6] The present dispute is inapposite in that it does not concern the nonoccurrence of a presupposed condition outside the parties' control. Because the present facts do not implicate impossibility of performance as addressed by Minn. § Stat. 336.2-615, Sunrich's argument fails.

### 3. Cancellation of the Contract

Sunrich also asks the Court to rule as a matter of law that Nutrisoya wrongly cancelled the Agreement when Sunrich did not deliver Order No. 267 by December 30, 2005. However, Sunrich sent a letter to Nutrisoya's counsel in January, 2006, stating: "In light of the events that have transpired over the past several months, it may be best if both parties work toward mutual cancellation of the current agreement and the winding down of the business relationship." Jenkins Letter, Jan. 16, 2006, Def.'s Ex. 17 [Docket 31-9] at 154. This letter could be viewed as an attempt by Sunrich, not Nutrisoya, to terminate the Agreement. Accordingly, summary

---

[6] See, e.g., Selland Pontiac-GMC, Inc. v. King, 384 N.W.2d 490 (Minn. Ct. App. 1986). Selland involved a contract where the seller agreed to provide four school bus bodies to the buyer. Id. at 491. The buyer intended to provide the busses to its customer before the start of the coming school year. Id. The contract provided that the bus bodies would be manufactured at a specific manufacturing plant. Id. The specified plant ceased operations before the seller could provide them to the buyer. Id. at 491-92. The court found that the parties had presupposed that the bodies would be available from the manufacturing plant specifically named in the agreement. Id. at 493. When this contingency ceased to occur, that is, when the manufacturer stopped making bus bodies, the seller's performance was made impracticable, and seller's failure to deliver the bus bodies was not considered a breach. Id.

judgment as to this issue is not appropriate.

**C. Damages**

Sunrich alternatively seeks summary judgment precluding any claim by Nutrisoya for damages extending beyond the initial term of the Agreement, which began April 1, 2004 and ended April 1, 2007. Renewal of the Agreement was premised on the following:

> TERM AND RENEWAL
>
> . . .
>
> 20.2 Nutrisoya shall have the right and option to renew this Agreement for a further period of three (3) years (the "Renewal Period"), provided that it has advised Sunrich, in writing, at least six (6) months prior to the expiry [sic] of the Term of its intention to exercise the said option, provided that during the twelve (12) month period prior to the exercise of the option, its purchases amount, on average, to at least five thousand (5,000) cases per month.
>
> 20.3 Subject to the foregoing, at its expiration this Agreement shall be renewed automatically on the same terms and conditions for successive periods of one (1) year (the "Renewal"), unless one of the parties, at least six (6) months before the expiration date of the Term or three (3) months before the expiration date of a Renewal Period, as the case may be, has given the other party a notice of non-renewal.

Kluz Decl., Ex. 1 at 115-16. As the language specifies, renewal is contingent upon Nutrisoya's purchase of a minimum quantity of Product, and on whether or not one of the parties has provided timely notice of non-renewal.

Damages for loss of prospective profits due to a breach of contract cannot be remote, speculative, or based on contingencies. Leoni v. Bemis Co., Inc., 255 N.W.2d 824, 826 (Minn. 1977), citing Carpenter v. Nelson, 101 N.W.2d 918, 921 (Minn. 1960); Hornblower & Weeks-Hemphill Noyes v. Lazare, 222 N.W.2d 799, 803 (Minn. 1974).

Because renewal of the Agreement was subject to a party's timely notice of non-renewal, any claim for damages suffered beyond the Agreement's initial three-year term would be

speculative and based on that contingency. Sunrich indicates that it "would have provided notice of nonrenewal of the Agreement by July 1, 2006" had the contractual relationship not deteriorated earlier. Jenkins Decl. [Docket No. 30] at ¶ 8. Accordingly, Nutrisoya's claim for damages from lost profits is limited to damages suffered prior to April 1, 2007.

## IV. CONCLUSION

For the foregoing reasons, Sunrich's Motion for Summary Judgment [Docket No. 27] is **DENIED** as to Count One of Nutrisoya's Complaint [Docket No. 1], and Sunrich's request to limit Nutrisoya to damages suffered prior to April 1, 2007 is **GRANTED.**

BY THE COURT:


s/ Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 5, 2009