UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nutrisoya Foods Inc.,
a Canadian Corporation,

        Plaintiff,

   v.                                   **MEMORANDUM OPINION
AND ORDER**

Sunrich, LLC, d/b/a                 Civil No. 08-25 ADM/JJK
Sunrich Foods, Inc.,
a Minnesota limited liability company,

        Defendant.

_____

Donald S. Arbour, Esq., Arbour Law Firm, Minneapolis, MN, on behalf of Plaintiff.

Eric A. Bartsch, Esq., Steven R. Kluz, Esq., and Emily L. Grande, Esq., Stoel Rives LLP, Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

In September, 2009, a jury trial was held before the undersigned United States District Judge on Plaintiff Nutrisoya Foods, Inc.'s ("Nutrisoya") claim for breach of contract relating to a Manufacturing and Packaging Agreement. The jury returned a verdict in favor of Nutrisoya and awarded $208,884.00 in damages. See Special Verdict Form [Docket No. 84].

At trial, Defendant Sunrich, LLC ("Sunrich") moved for judgment as a matter of law following Nutrisoya's case in chief and again at the close of evidence. Sunrich now brings this Motion for Judgment as a Matter of Law or for a New Trial [Docket No. 85]. For the reasons stated below, Sunrich's Motion is denied.

## II. BACKGROUND

In January, 2004, the parties entered into a written contract entitled "Manufacturing and Packaging Agreement" (the "Agreement") which governed the production, packaging and

delivery of a rice milk product (the "Product"). Pl. Ex. 1. The Agreement's stated purpose was for Sunrich to "manufacture and package the Product for Nutrisoya . . . subject to the terms and conditions" of the Agreement. Id. ¶¶ 4-4.1. The terms and conditions included: (1) pricing of $9 per case of Product; (2) delivery of the Product at Sunrich's expense from Sunrich's plant in Alexandria, Minnesota to Nutrisoya's warehouse in Montreal, Canada; and (3) an initial contract term of three years beginning April 2004 and ending March 2007. Id. ¶¶ 2.3, 9.1, 10.1, 20.1. The Agreement entitled Sunrich to adjust the Product price if the costs of manufacturing the Product increased, but Sunrich was required to give Nutrisoya three full calendar months of written notice and to provide documents substantiating the increased costs. Id. ¶ 10.2. The Agreement also required Nutrisoya to "transmit in writing to Sunrich, as required by Sunrich, a monthly manufacturing and packaging projection plan for the Product, for a period of three consecutive months," and to transmit to Sunrich, at least 21 days before the beginning of each month, a written plan confirmation for Sunrich's approval. Id. ¶¶ 6.1-6.2.

During the parties' contractual relationship, which lasted approximately two years, the undisputed evidence was that no manufacturing and packaging plans were submitted by Nutrisoya. Instead, the parties scheduled orders informally. Initially, Nutrisoya called to inform Sunrich of its need for Product and to schedule a production date. Testimony of S. Cote. Later, Nutrisoya sent purchase orders without first calling Sunrich, and if the production date on the order needed to be changed, Sunrich would contact Nutrisoya to arrange for a different production date. Id.

In October, 2005, Sunrich's parent company, SunOpta, issued a press release announcing a contract under which SunOpta would produce soymilk for a major global retailer. Pl. Ex. 2.

Production was to be at the same Sunrich facility where the Nutrisoya Product was packaged. Id.; Testimony of N. Hammer.

On October 15, 2005, Nutrisoya ordered 20,000 cases of Product with a requested delivery date of December 30, 2005. Pl. Ex. 20. The following day, at the request of Sunrich, the order was divided into two parts: (1) revised Purchase Order 266 specifying 10,000 cases of Product for delivery on November 24, 2005, and (2) Purchase Order 267 specifying the remaining cases of Product for delivery on December 30, 2005. Pl. Exs. 12, 20; Testimony of L. Karass. Sunrich filled Purchase Order 266 in early December. Testimony of L. Karass.

On December 1, 2005, Sunrich's Vice President of Operations, Kim Jenkins ("Jenkins"), called Nutrisoya's Vice President of Sales and Marketing, Larry Karass ("Karass"), to advise him that Sunrich was considering getting out of the rice business and might assign the Agreement to another packing company, Soylutions. Testimony of L. Karass. Shortly after their conversation, Karass sent Jenkins an e-mail expressing his alarm and concern over Sunrich's possible transfer of Nutrisoya's production to a "floundering competitor." Pl. Ex. 7. Karass requested a conference call to discuss Sunrich's plans. Id. Despite Jenkins' assurances a conference call would be held, Sunrich never scheduled the conference. Pl. Exs. 7, 8; Testimony of L. Karass. On December 9, 2005, nearly eight weeks after placing Order 267, Nutrisoya requested confirmation that the order would be shipped in December 2005. Pl. Ex. 9. Sunrich responded that no production would occur in December 2005, and that all further scheduling must be discussed with Jenkins. Pl. Ex. 10. Nutrisoya advised Jenkins of its urgent need for Product and requested a delivery date in January. Pl. Ex. 12; Testimony of L. Karass. Twelve days later, Jenkins responded "that product would be available for pickup in Quebec City

towards the first weeks of March." Pl. Ex. 13. Karass replied that Nutrisoya was out of stock and unable to wait until March, 2006. Pl. Ex. 14.

Evidence at trial showed that Sunrich embarked on an "exploratory scouting mission" to determine whether another packaging company could provide Product for Nutrisoya, but did not finalize an agreement with another company to fill Nutrisoya's Order 267. Testimony of K. Jenkins. There was no evidence that Sunrich ever provided Nutrisoya with notice of and documents to support an increase in the price of the Product before the parties ceased communicating in mid-January, 2006.

The Special Verdict Form asked whether Sunrich breached the Agreement "by not filling Purchase Order 267," to which the jury answered "Yes." The Special Verdict Form next asked whether Paragraph 6 of the Agreement "required Nutrisoya to submit one month and three month planning forecasts before Sunrich would fill Purchase Order 267," to which the jury answered "No." The jury further found that Sunrich's breach of contract directly caused damage to Nutrisoya, and awarded damages to Nutrisoya totaling $208,884.00. Special Verdict Form at 3.

## III. DISCUSSION

### A. Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate only when there is insufficient evidence to permit a reasonable jury to find in favor of the nonmoving party. Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996). The facts must be viewed in the light most favorable to the verdict, assuming that the jury resolved all evidentiary conflicts in favor of the prevailing party. Van Steenburgh v. Rival Co., 171 F.3d 1155, 1158 (8th Cir. 1999). The Court will "not weigh,

4

evaluate, or consider the credibility of the evidence." Triton Corp. v. Hardrives, Inc., 85 F.3d 343, 345 (8th Cir. 1996). A jury's verdict should not be overturned unless no reasonable juror could have found in favor of the prevailing party. Van Steenburgh, 171 F.3d at 1158; Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997). "A jury verdict will not be set aside unless there is a complete absence of probative facts to support a verdict." Walsh v. National Computer Systems, Inc., 332 F.3d 1150, 1158 (8th Cir. 2003) (quotation omitted).

 **1. Evidence of Contract Formation**

Sunrich urges it is entitled to judgment as a matter of law because there was no evidence of Sunrich's written acceptance of Order 267, and therefore no contract was formed. Sunrich characterizes the Agreement as one where certain terms were agreed upon but other terms such as quantities to be ordered and delivery dates were left open for future negotiations. Sunrich asserts that each future negotiation was to form a separate contract. Under this theory, Sunrich contends that Order 267 represented an offer by Nutrisoya to purchase product with a December 30, 2005 delivery date, and that Nutrisoya presented no evidence at trial to show Sunrich's written acceptance of the offer.

However, Nutrisoya sued Sunrich for breaching the Agreement as a whole, not merely Order 267. See Compl. [Docket No. 1] ¶ 29. Nutrisoya introduced evidence of the Agreement, Pl. Ex. 1, and Sunrich does not dispute its existence or validity. Answer [Docket No. 17] ¶ 7. Therefore, sufficient evidence exists to prove the element of contract formation.[1]

---

[1] Sunrich's "multiple contract" theory also fails as a matter of law because it directly conflicts with the statutory provision defining an installment contract as one which requires or authorizes the delivery and acceptance of goods in separate lots, "even though the contract contains a clause [that] 'each delivery is a separate contract' or its equivalent." Minn. Stat. § 336.2-612(1). The definition is designed to reject the approach that each delivery under an

5

## 2. Breach of Installment Contract

Sunrich further argues that the Agreement was an installment contract, and Nutrisoya failed to present evidence that Sunrich's breach of a single installment resulted in a material breach of the entire Agreement. Sunrich contends that Nutrisoya merely presented evidence of a "perceived delay" in delivery of Order 267, which did not substantially impair the entire Agreement. Def.'s Mem. at 23-24.

Breach of an installment contract occurs when "noncomformity . . . with respect to one or more installments substantially impairs the value of the whole contract." Minn. Stat. § 336.2-612(3). The plain text of the statute indicates that breach of a single installment will result in a breach of the whole contract if the value of the whole contract is substantially impaired. See id. Although "substantial impairment" is not defined under the statute, courts equate it with the common-law concept of "material breach" as it applies to contracts generally. Lord, R., 15 Williston on Contracts § 45:24 (4th ed.) (2009); see also Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 353 (Minn. 1977) (considering "substantial impairment" "akin to the determination of a material breach under traditional contract law"); Herbstman v. Eastman Kodak Co., 342 A.2d 181, 185 (N.J. 1975) ("The Code has restated materiality in terms of substantial impairment of

---

installment contract constitutes a separate contract. Minn. Stat. § 336.2-612, Uniform Commercial Code Comment 3. "[A] commercial reading of the language under the section on good faith and commercial standards requires that the singleness of the document and the negotiation, together with the sense of the situation, prevail over any uncommercial and legalistic interpretation." Id. A common sense reading of the installment contract definition supports the view that separate deliveries do not represent separate contracts. The definition refers to a buyer's acceptance of separate *deliveries*, but does not contemplate a seller's acceptance of separate *orders*. See Minn. Stat. § 336.2-612 (1). Imposing a requirement that each order must be separately accepted defeats the purpose of an installment contract, which by nature and definition contemplates a contractual agreement carried out through a series of deliveries.

value to the buyer"); Cargill, Inc. v. Storms Agri Enterprises, Inc., 878 S.W.2d 786 (Ark. 1994) ("The phrase 'substantially impair' . . . requires the factfinder to look at the materiality of a party's repudiation as it relates to the entire contract").

"Minnesota caselaw has not clearly defined 'material breach,' [however] *Black's Law Dictionary* defines it as '[a] breach of contract that is significant enough to permit the aggrieved party to elect to treat the breach as total (rather than partial), thus excusing that party from further performance and affording it the right to sue for damages.'" Sitek v. Striker, 764 N.W.2d 585, 593 (Minn. App. 2009) (quoting Garner, B., Black's Law Dictionary 200 (8th ed. 2004)).

The evidence adduced at trial, when viewed in the light most favorable to Nutrisoya, was that: (1) after filling Order 266 dated October 16, 2005, Sunrich never scheduled or offered to schedule further production of Nutrisoya's Product under the terms set forth in the Agreement;[2] (2) Order 267, placed in October 2005, was never filled; (3) in early December, 2005, Sunrich informed Nutrisoya it was considering getting out of the rice milk business and suggested Nutrisoya contract with another manufacturer; (4) Sunrich's manufacturing plant in Alexandria, Minnesota was filled to capacity in December 2005 and January 2006; and (5) Sunrich never reached an agreement with another packaging company to fill Order 267. This evidence was clearly sufficient to allow a reasonable jury to conclude that Sunrich's failure to deliver the installment requested under Order 267 substantially impaired the value of the whole Agreement, the purpose of which was to "manufacture and package the Product for Nutrisoya."

---

[2] Jenkins' communication that Product would be available for pick up in Quebec City did not conform with the terms of the Agreement, which obligated Sunrich to provide transportation "f.o.b. Nutrisoya's Montreal warehouse." See Pl. Ex. 1 ¶ 10.1. Quebec City is 200 miles from Montreal. Testimony of L. Karass.

Sunrich further asserts that the Agreement lacked a "time is of the essence" clause, and thus, as a matter of law, Sunrich's delay in performance did not substantially impair the Agreement.  However, the evidence adduced at trial showed that Sunrich never shipped the Product requested in Order 267, not that performance was merely delayed.  Sunrich has cited no authority for the proposition that the absence of a "time is of the essence" clause will, as a matter of law, excuse a party from performing altogether.  Sunrich's Motion for judgment as a matter of law is denied.

**B.  Motion for a New Trial**

Sunrich also seeks a new trial under Federal Rule of Civil Procedure 59.  The decision whether to grant a new trial is committed to the discretion of the district court.  Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995).  "A new trial is required only when necessary to avoid a miscarriage of justice."  Gearin v. Wal-Mart Stores, Inc., 53 F.3d 216, 219 (8th Cir. 1994) (citing McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994)).  "While the standard for granting a new trial is less than that for a judgment as a matter of law, a new trial shall be granted only to prevent injustice or when the verdict strongly conflicts with the great weight of evidence."  Maxwell v. Baker, Inc., 160 F.R.D. 580, 581 (D. Minn. 1995).

In addition, a new trial may be ordered if the court erred in instructing the jury on the applicable law.  T.H.S. Northstar Assocs. v. W.R. Grace & Co.-Conn., 860 F. Supp. 640, 650 (D. Minn. 1994), vacated on other grounds, 66 F.3d 173 (8th Cir. 1995).  A district court, however, has broad discretion in framing instructions and need not give every proposed instruction as long as the court adequately presents the law and the issues to the jury.  Fleming v. Harris, 39 F.3d 905, 907 (8th Cir. 1994).  Moreover, the instructions are to be considered in their entirety to

determine whether, when read as a whole, the charge fairly and adequately submits the issues to the jury. Laubach v. Otis Elevator Co., 37 F.3d 427, 429 (8th Cir. 1994). "A single erroneous instruction will not necessarily require reversal." Id.

Sunrich bases its request for a new trial on a number of grounds. First, Sunrich contends the Court failed to give proper jury instructions on the issues of contract formation, breach of an installment contract, contract modification, and contract assignment or delegation. Second, Sunrich argues the Court committed prejudicial error by excluding evidence of Nutrisoya's non-payment under the Agreement and evidence that Sunrich would have increased the price of the Product under the Agreement. Finally, Sunrich contends the Court erred by including a question regarding contract interpretation on the Special Verdict Form submitted to the jury.

### 1. Jury Instructions

Sunrich urges it was error for the Court not to include jury instructions regarding contract formation, because Order 267 constituted an offer by Nutrisoya that was never accepted by Sunrich. As discussed earlier, Nutrisoya's contract claim is based on Sunrich's breach of the Agreement, and Sunrich did not dispute the Agreement's existence. Whether Sunrich accepted Order 267 has no bearing on the Agreement's validity or formation. Additionally, Sunrich's contract formation theory lacks legal merit. See supra n.1. Thus, it was not error for the Court to exclude Sunrich's proposed jury instruction regarding contract formation.[3]

Sunrich also argues the Court failed to give proper instructions regarding breach of an

---

[3] Ironically, although Sunrich insists that its refusal to accept Order 267 is "central to its case," Sunrich's refusal to provide Nutrisoya with Product serves as evidence that Sunrich breached the Agreement's stated purpose, which was for Sunrich to manufacture and package Product for Nutrisoya. See Pl. Ex. 1 ¶ 4-4.1.

9

installment contract. Sunrich urges the instruction given by the Court deprived the jury of the option to find that Sunrich breached only one installment under the Agreement, and that damages should have been limited to the costs of covering the breached installment only, as opposed to cover damages for the remaining term of the Agreement.

The jury was instructed:

> Question No. 1 in the Special Verdict Form asks you to determine if Defendant Sunrich, LLC breached the contract with Plaintiff Nutrisoya Foods, Inc. by not filling Purchase Order 267. The contract in this case is the Manufacturing and Packaging Agreement (Plaintiff's Exhibit 1, also Defendant's Exhibit 1).
> In considering your answer to Question No. 1, you are instructed that a contract is breached when there is a failure to perform an important part of a contract. A breach of a contract by one party excuses performance by the other. The time for shipment or delivery or any action under a contract if not agreed upon shall be a reasonable time.

Jury Instruction No. 18 [Docket No. 77].

As discussed earlier, breach of a single installment under an installment contract will result in a breach of the whole contract if the breach substantially impairs the contract. Minn. Stat. § 336.2-612(3). Jury Instruction No. 18 properly adhered to the standard for breach of an installment contract under Minn. Stat. § 336.2-612(3) because it instructed the jury to determine whether Sunrich's breach of a single installment ("not filling Purchase Order 267") resulted in a breach of the installment contract ("the Manufacturing and Packaging Agreement"). In turn, the instruction defined breach as "a failure to perform an important part of the contract," which equates to the standard of "substantial impairment."[4] Nothing in the instruction prevented the

---

[4] As discussed earlier, courts determine "substantial impairment" by applying the common-law concept of material breach of contract. Jury Instruction No. 18 defined breach of contract as a failure to perform an important part of a contract. This definition was taken directly

10

jury from finding that Order 267 was not an important part of the Agreement and that a breach of the Agreement did not occur.  Similarly, nothing in Jury Instruction No. 24 relating to the calculation of cover damages prevented the jury from limiting damages to the costs of covering a single installment.  See Jury Instruction No. 24 (providing method for calculating cover damages in the event the jury found "Sunrich failed to make delivery *or* repudiated the contract") (emphasis added).  Thus, when read as a whole, the jury instructions regarding contract breach and damages fairly and adequately submitted those issues to the jury.

Sunrich also argues the Court improperly instructed the jury that "[t]he time for shipment or delivery or any action under a contract if not agreed upon shall be a reasonable time."  Jury Instruction No. 18.  Sunrich argues that this standard "gap-filler" provision, which applies to contracts lacking specific delivery dates, see Minn. Stat. § 336.2-209, violates the Agreement's anti-modification clause, which requires modifications to be evidenced in a signed writing by both parties.  Pl. Ex. ¶ 22.5.  Sunrich admits the Agreement did not include a delivery term, and also asserts the parties never agreed on a delivery date.  Therefore, the "gap-filler" provision does not modify an existing term of the Agreement, it merely applies a reasonable standard to a term which is lacking.  As such, the jury instruction regarding the "gap-filler" provision was proper.

Finally, Sunrich contends the Court should have instructed the jury that Sunrich had the right to delegate its duties under the Agreement.  Sunrich argues the instruction was necessary because Nutrisoya's counsel argued that such an assignment was prohibited.  However, the issue regarding contract delegation or assignment was not relevant, because there was no evidence that

---

from the Minnesota jury instruction guidelines.  See 4 Minnesota Practice, CIVJIG 20.45 (1999) (defining breach of contract as a failure to perform a substantial or an important part of the contract).

Sunrich had in fact delegated or assigned its duties under the contract with Nutrisoya. Therefore, the issue of whether Sunrich had a right to do so was not relevant, and the Court's refusal to give Sunrich's requested jury instruction regarding delegation or assignment was neither erroneous nor prejudicial.

### 2. Evidentiary Rulings

An "allegedly erroneous evidentiary ruling does not warrant a new trial unless the [ruling] was so prejudicial that a new trial would likely produce a different result." Goss Int'l. Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, 434 F.3d 1081, 1098 (8th Cir. 2006) (quotation omitted). During trial, the Court made two evidentiary rulings opposed by Sunrich. First, the Court denied Sunrich's request to allow evidence of Nutrisoya's failure to pay for Product shipped in December, 2005 under Order 266. The Court ruled the issue had not been properly joined for trial because Sunrich did not raise the issue in its pleadings or pretrial motions. Because Sunrich had ample opportunity to raise the issue prior to trial and did not do so, prohibiting evidence of Nutrisoya's nonpayment of a prior order at trial did not result in prejudice to Sunrich.

Second, the Court limited evidence regarding a price increase under the Agreement to evidence which may have justified an increase after mid-April, 2006. The ruling was based on Sunrich's failure to provide notice of a price increase before the parties ceased communicating in mid-January, 2006. The price escalation clause of the Agreement required three calendar months' notice and supporting documentation before Sunrich could have increased the price of the Product. Pl. Ex. 1 ¶ 10.2. Therefore, had the parties continued to communicate beyond mid-January and Sunrich provided notice of a price increase, the price could not have increased for at

12

least three months, which would have been mid-April, 2006. Accordingly, the Court ruled that it would allow evidence showing increased costs which may have justified a contract price increase in mid-April.[5] Sunrich's Vice President of Finance and its expert witness, John Ruelle, testified regarding increased costs for the Product's ingredients and packaging, as well as Sunrich's corporate procedures for increasing its customers' contract prices. During Ruelle's testimony, Sunrich did not present the exhibits which Sunrich alleges were suppressed by the Court, and therefore the Court did not rule on their admissibility. Thus, the Court's ruling allowing evidence of a price increase after mid April, 2006 was not erroneous and did not prejudice Sunrich.

### 3. Special Verdict Form Question 2

Sunrich contends the Court erroneously permitted the jury to make a legal conclusion on the Special Verdict Form by asking in Question 2: "Did Paragraph 6 of the contract between Sunrich and Nutrisoya require Nutrisoya to submit one month and three month planning forecasts before Sunrich would fill Purchase order 267?"

The "meaning of an ambiguous contract provision presents a question of fact for the jury. . . . A contract is ambiguous when it is reasonably susceptible to more than one interpretation or construction." Midwest Communications v. Minnesota Twins, Inc., 779 F.2d 444, 455 (8th Cir. 1985) (citations omitted). Sunrich argues the language in Paragraph 6 of the Agreement

---

[5] Sunrich mischaracterizes the Court's ruling when it states: "the [C]ourt ruled that Sunrich could not rebut Nutrisoya's cover damages claim by submitting extrinsic evidence in the form of bill of material and invoice exhibits to prove what the 2004 contract price would have been in 2006, after application of the price escalation clause in the contract." Mem. of Law in Supp. of Mot. for J. as a Matter of Law [Docket No. 87] at 9. The Court initially ruled that no evidence of a price increase would be allowed, but prior to the testimony of Sunrich's expert witness, John Ruelle, the Court modified its ruling to allow evidence of increased costs supporting a price increase which may have become effective ninety days after the parties ceased communicating.

13

unambiguously required the forecasts, and thus Question 2 was a question of law which the Court should not have submitted to the jury. However, the language in Paragraph 6 states that Nutrisoya would "transmit in writing to Sunrich, *as required by Sunrich*, a monthly manufacturing an packaging plan for the Product." See Pl. Ex. 1 ¶ 6.1 (emphasis added). As Nutrisoya argued in its summary judgment motion and as the trial testimony revealed, Nutrisoya interpreted the language in Paragraph 6 to mean that Nutrisoya would submit written planning forecasts if Sunrich required them. Def.'s Mem. of Law in Opp. to Summ. J. [Docket No. 33] at 19-20; Testimony of L. Karass. This interpretation was consistent with the testimony of Nutrisoya and Sunrich's witnesses who testified that Sunrich did not always require customers to submit manufacturing and packaging plans before filling orders. Testimony of L. Karass; Testimony of S. Cote; Testimony of M. Tagatz; Testimony of K. Jenkins. Because Paragraph 6 was reasonably susceptible to more than one interpretation, the language was ambiguous, and the Court did not err in submitting the question of its meaning to the jury.

## IV. CONCLUSION

For the foregoing reasons, Sunrich's Motion for Judgment as a Matter of Law or for a New Trial [Docket No. 85] is **DENIED.**

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: January 15, 2010.

14